UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
JOSEPH OLIVIERI, ARTHUR GODSELL, ROBERT
CARLINO, PAUL J. O'BRIEN, JOSEPH GANIRO,
ALFREDO REZENDE, GEORGE FRANK, JOHN
FUCHS, FRED DAUBER, RALPH BONAVIST,
WAYNE ROGERS, WILLIAM SMITH, HOWARD
JONES, WILLIAM MACCHIONE, ALAN EHL,
WILLIAM HAMILTON, et al., as Trustees of the
SUBURBAN NEW YORK REGIONAL COUNCIL
OF CARPENTERS WELFARE, PENSION,
VACATION, ANNUITY, APPRENTICE
TRAINING AND CHARITABLE TRUST FUNDS,

                      Plaintiffs,               **MEMORANDUM OF DECISION AND ORDER**

        -against-                           00-CV-903 (DRH)(ARL)

P.M.B. CONSTRUCTION, INC., PMB
DEVELOPMENT, FREDERIC A. MARSALISI,
PATRICIA M. MARSALISI a/k/a PATRICIA M.
BISACCIA, PMB FLOORING, INC., PMB
DEVELOPMENT TEAM CORP., SYNGEN GROUP
CORP., a/k/a TRI-STATE EMPLOYMENT
SERVICES, PREMIER STAFFING SOLUTIONS
OF NORTHEAST CORP. a/k/a PREMIER
STAFFING, CAPITAL MANAGEMENT
SOLUTIONS, LLC, STERLING PAYROLL
FINANCIAL SERVICES, LLC, VIRTUAL REALTY
SOLUTIONS, INC. a/k/a STERLING BUSINESS
SOLUTIONS, and EMPLOYMENT SERVICES, INC.,

                      Defendants.
----------------------------------------------------------------X
**APPEARANCES:**

**For the Plaintiffs:**
**Andrew J. Turro, Esq.**
Meyer, Suozzi, English & Klein, P.C.
1505 Kellum Place
Post Office Box 803
Mineola, New York 11501-0803

**For the Defendants Premier Staffing Solutions of Northeast Corp. a/k/a Premier Staffing and Syngen Group Corp. a/k/a Tri-State Employment Services:**

**James J. Armenakis, Esq.**
Armenakis & Armenakis
432 Park Avenue South, Second Floor
New York, New York 10016

**HURLEY, District Judge:**

Presently before the Court are the motions by plaintiffs the Trustees of Suburban New York Regional Council of Carpenters Welfare, Pension, Vacation, Annuity, Apprentice Training and Charitable Trust Funds ("Plaintiffs") and defendants Syngen Group Corp. a/k/a Tri-state Employment Services ("Syngen") and Premier Staffing Solutions of Northeast Corp. a/k/a Premier Staffing ("Premier") (collectively, the "Premier Defendants") for summary judgment. For the reasons that follow, Plaintiffs' motion is denied and the Premier Defendants' motion is granted.

## FACTUAL BACKGROUND

The following facts are undisputed unless noted. Plaintiffs commenced this action to recover unpaid employee fringe benefit contributions from defendants P.M.B. Construction, Inc., PMB Development, Inc., Frederic A. Marsalisi, Patricia M. Marsalisi a/k/a Patricia M. Bisaccia, PMB Flooring, Inc., and PMB Development Team Corp. (collectively, the "PMB Defendants"); the Premier Defendants; Capital Management Solutions, LLC ("Capital"); Sterling Payroll Financial Services, LLC ("Sterling Payroll"); Virtual Realty Solutions, Inc. a/k/a Sterling Business Solutions, Inc. ("Sterling Business"); and Employment Services, Inc., arising under collective bargaining agreements entered into between the PMB Defendants and the United Brotherhood of Carpenters and/or its predecessors, and their affiliated local unions (the "Union"). On June 27, 2002, Sterling Business filed for bankruptcy. By Stipulation and Order dated July 2, 2003, the action was dismissed as to defendant Employment Services, Inc.

By Stipulation dated June 25, 2003 (the "Stipulation"), Plaintiffs and the Premier Defendants stipulated that the PMB Defendants are jointly and severally liable to Plaintiffs for unpaid fringe benefit contributions, with interest and attorneys' fees, and that they breached the underlying collective bargaining agreements in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"). (Stipulation dated June 25, 2003 ¶¶ 29-30.) On June 30, 2004, default judgments were entered against the PMB Defendants, Capital, and Sterling Payroll in an amount of $296,876.36. According to Plaintiffs, no part of this judgment has been paid. (Aff. of Patrick Morin, dated July 19, 2004, ¶ 10.) Thus, the Premier Defendants are the remaining defendants in this lawsuit.

The Premier Defendants were professional employers' organizations providing human resources to their clients in the tri-state area. Typically, their clients "fired" their employees who were then hired by the Premier Defendants, who subsequently leased the employees back to those same clients for a fee. The Premier Defendants administered the payroll for the employees based upon information provided by the clients, assumed responsibility for the payment and collection of payroll taxes, and secured workers compensation coverage for the employees. According to the Premier Defendants, the ability of the client companies to obtain workers compensation at a lower rate was a key selling point that enabled the Premier Defendants to enroll clients and thereby earn fees. (Aff. of John Armenakis, dated Sept. 29, 2004, ¶ 20.)

Between 1998 and 1999, the Premier Defendants entered into three Client Service Agreements with certain of the PMB Defendants whereby the Premier Defendants leased carpentry employees to the PMB Defendants for employment covered under the Agreements.

Pursuant to the express terms of each of the Client Services Agreements, the Premier Defendants: (1) shared with the PMB Defendants the right to hire, fire, discipline, manage, and supervise the employees it leased; (2) provided work site employee insurance, including unemployment, workers' compensation, and disability insurance with respect to each of the employees it leased based upon information provided by the PMB Defendants; (3) had the right to share responsibilities of setting and/or overseeing working conditions with respect to the employees it leased; (4) provided the PMB Defendants with entity payroll services and had the right to share with them the responsibilities of employee wage withholdings and tax reporting requirements based upon information provided by the PMB Defendants; and (5) had the right to ensure and/or monitor compliance with applicable governing worker and worksite safety rules, regulations, and laws with respect to the employees it leased. While the Premier Defendants expressly retained the above-referenced rights, the parties agree that there is nothing in the record to indicate that the Premier Defendants actually *exercised* their contractual rights to hire, fire, discipline, manage or provide direct, on-site supervision of the leased workers.

The Premier Defendants were not signatories to the collective bargaining agreements between the PMB Defendants and the Union. Moreover, under the Client Service Agreements, the Premier Defendants did not agree to undertake any obligation to withhold, pay, collect, secure or provide for *any* union benefits, including but not limited to fringe benefit contributions in connection with any collective bargaining agreements with any union.

With regard to the PMB Defendants' obligations, the Client Services Agreements provided that the PMB Defendants were to furnish all of the instrumentalities used in the employees' work, including but not limited to all facilities, supplies, equipment, and all other

necessary items that may be required by the leased employees to perform their respective duties and services. Upon termination of the Client Services Agreements, the leased employees were automatically terminated by the Premier Defendants.

Plaintiffs move for summary judgment and urge the Court to find as a matter of law that the Premier Defendants were "joint employers" with certain of the PMB Defendants in 1998 and 1999, and are therefore jointly and severally liable under the relevant collective bargaining agreements for monies owed by the PMB Defendants to Plaintiffs during this two-year period. The Premier Defendants also move for summary judgment, maintaining that as non-signatories to the relevant collective bargaining agreements, they are not "employers" within the purview of ERISA and are therefore not obligated to make contributions.

## **DISCUSSION**

For purposes of this motion, it will be assumed, *arguendo*, that the Premier Defendants were joint employers with the PMB Defendants. The discreet issue presented by these motions is whether that status, i.e., being a joint employer, is sufficient to obligate a non-signatory to a collective bargaining agreement to make employer contributions pursuant thereto absent any allegations of fraud or alter ego.[1] The Court begins with an analysis of the relevant ERISA provisions.

---

[1] The Court is aware of the parties' stipulation regarding George Kalaitzis' (the President of Syngen and Premier) invocation of his Fifth Amendment privilege against self-discrimination and that Mr. Kalaitzis declined to give testimony on behalf of the Premier Defendants in this case. (*See* Defs.' Notice of Mot. Ex. G.) Plaintiffs seek to offer this fact into evidence so that the Court may draw an adverse inference as to the Premier Defendants' status as joint employer. It is not proffered to suggest fraud or any other exception that might render the Premier Defendants liable as nonsignatories to the relevant collective bargaining agreements.

## I. *Statutory Definition of Employer*

Section 515 of ERISA provides that "[e]very employer who is *obligated to make contributions* to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145 ("Section 515") (emphasis added). ERISA defines an employer as "any person acting directly as an employer, or indirectly in the interest of an employer." *Id.* § 1002(5)

In *Cement and Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Funs and Annuity Fund v. Lollo*, 35 F.3d 29, 36 (2d Cir. 1994), the Second Circuit held that Section 515 applies only to employers "obligated" to make contributions. Thus, satisfying the statutory definition of employer as provided for in 29 U.S.C. § 1002(5) is in itself insufficient to impose a duty on an employer to make pension contributions; rather, Section 515 "permits recovery only against those employers who are already obligated, in the absence of ERISA, to make ERISA contributions." *Id.*; *see id* at 36-37 ("[Section 515] does not impose a duty to make pension contributions, even on one who qualifies as an 'employer' under the general definition provided in 29 U.S.C. § 1002(5), if the duty to contribute did not previously exist."). "This interpretation is reinforced by the section's legislative history, which stated in a report produced by the Senate Committee on Labor that ' "[t]he bill imposes a Federal statutory duty to contribute on employers that are *already contractually* obligated to make contributions to multiemployer plans."' *Id.* at 36 (quoting *Massachusetts Laborers' Health & Welfare Fund v. Starrett Paving Corp.*, 845 F.2d 23, 25 (1st Cir. 1988) (quoting Staff of Senate Committee on

Labor and Human Resources, 96th Cong., 2d Sess., The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration 44 (Comm. Print.1980)) (emphasis added by First Circuit)).

## II.     *When is an ERISA Employer Obligated to Make Contributions?*

Generally, an employer becomes obligated to make contributions when it has signed a collective bargaining agreement. *See, e.g., Hardy v. Kaszycki & Sons Contractors, Inc.*, 870 F. Supp. 489, 494 (S.D.N.Y. 1994); *see also Lollo*, 35 F.3d at 37 (finding corporate officer who assumed responsibility for his company's ERISA obligations as part of a collective bargaining agreement to be contractually obligated, "wholly independently of ERISA," to make pension contributions). The Second Circuit has recognized, however, that in "extraordinary cases," an individual officer or director who did not sign the collective bargaining agreement in an individual capacity may nonetheless be held personally liable for the corporation's delinquent contributions where that individual "has committed fraud . . . or acted in concert with a fiduciary to breach a fiduciary obligation." *Lollo*, 35 F.3d at 36 (citing *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987) and *Sasso v. Cervoni*, 985 F.2d 49, 50-51 (2d Cir. 1993)); *see also Leddy v. Standard Drywall, Inc.*, 875 F.2d 383 (2d Cir. 1989) (holding corporate officer liable for ERISA obligations where he had been convicted of criminal conspiracy to defraud the funds). Similarly, many lower courts have imposed liability under a "piercing the corporate veil" or "alter ego" theory. *See McGuinness v. Marvin Hammerman, Inc.*, No. 91 CIV 4061, 1994 WL 172403 (S.D.N.Y. May 4, 1994) (denying individual defendants' motion for summary judgment on ground that plaintiffs had alleged a disregard of the corporate form); *Newspaper & Mail Deliverers' Union of N.Y. & Vicinity v. United Magazine Co.*, 829 F. Supp. 561 (E.D.N.Y.

1993) (holding that complaint which alleged that individual defendants were alter egos of corporate employer properly alleged a claim under ERISA); *Textile Workers Pension Fund v. Oltremare*, 764 F. Supp. 287 (S.D.N.Y. 1989) (holding controlling persons liable for unpaid contributions if evidence established that corporate form should be disregarded); *Solomon v. R.E.K. Dress*, 670 F. Supp. 96, 99 (S.D.N.Y. 1987) (holding that President and sole shareholder could be liable for corporation's failure to make contributions to plan if circumstances of case warranted piercing the corporate veil); *Solomon v. Laranne Sportswear Corp.*, 648 F. Supp. 407 (E.D.N.Y. 1986) (holding corporate officer not liable for delinquent pension contributions under ERISA unless he dealt with corporation in such a way as to justify piercing corporate veil).

Furthermore, the Second Circuit has held that sureties and contractors who are not signatories to collective bargaining agreements, even if they assume financial guarantees of contribution payments, do not qualify as ERISA "employers." *See Bleiler v. Cristwood Constr., Inc.*, 72 F.3d 13 (2d Cir. 1995); *Greenblatt v. Delta Plumbing & Heating Corp.*, 68 F.3d 561 (2d Cir. 1995). In *Greenblatt*, a plumbing industry board brought an action against an employer's surety, who had not signed the collective bargaining agreement, to recover on a surety bond after the employer defaulted on its obligations to make benefit payments. Holding that the surety was not an employer within the purview of ERISA, the court explained:

> We are not dealing with any type of agency or ownership relationship or direct assumption of the employer's functions with regard to the administration of a plan. We are confronted only with a contractual relationship separate from the collective bargaining agreement by which the surety guaranteed payment of a certain sum if the contractor defaulted on its obligations.

68 F.3d at 575-76.

Similarly, in *Bleiler*, a union trustee brought an action against a general contractor

-8-

and its surety to collect unpaid fund contributions owed by a subcontractor. The general contractor was not a signatory to the collection bargaining agreement. Despite the fact that the general contractor guaranteed the subcontractor's payments to the funds, the court determined that the general contractor was not an employer within the meaning of ERISA absent evidence that the general contractor owned the subcontractor, functioned as its agent, or assumed its functions with regard to an ERISA plan. 72 F.3d at 15. The court concluded that "contractors who are not signatories to collective agreements, but who assume financial guarantees of contribution payments, do not qualify as ERISA employers." *Id.* at 16. Particularly relevant to the instant case, the court noted that it "need not decide whether, as the Eleventh Circuit has held, nonsignatory status alone disqualifies a party as an ERISA employer, or whether, as the Ninth Circuit has suggested, other factors may bring a nonsignatory within the definition of an ERISA employer." *Id.* n.2 (citations omitted).

### III.    *Application to the Present Facts*

In the instant case, Plaintiffs do not contend that the Premier Defendants entered into a fraudulent arrangement with the PMB Defendants in an attempt to avoid the obligations of the collective bargaining agreements. Moreover, Plaintiffs do not claim that the Premier Defendants acted as the alter ego of the PMB Defendants, nor do Plaintiffs assert any kind of piercing of the corporate veil claim. Instead, Plaintiffs seek to impute liability on the Premier Defendants solely based on their alleged status as "joint employer." In essence, Plaintiffs urge the Court to find that the Premier Defendants' actual and potential control over the leased workforce qualified them as joint employers with the PMB Defendants and, therefore, the Premier Defendants are jointly and severally liable for monies owed by the PMB Defendants.

The Premier Defendants counter that Plaintiffs have failed to cite any precedent warranting such a conclusion.

### A. Relevant Second Circuit Case Law

In support of their claim, Plaintiffs rely primarily on *Hardy v. Kaszycki & Sons Contractors, Inc.*, 870 F. Supp. 489 (S.D.N.Y. 1994). In that case, Trump Equitable hired the Kaszycki Corporation to demolish a building to make way for Trump Tower. The Kaszycki Corporation hired workers with whom it later entered into a collective bargaining agreement. Trump Equitable did not sign the agreement. In denying the motion by Trump Equitable for summary judgment on plaintiffs' claim that Trump Equitable was liable for contributions under ERISA, the district court found that genuine issues of material fact existed as to whether Trump Equitable could be considered joint employers with the Kaszycki Corporation, *id.* at 495, stating that "in this case the Second Circuit has twice acknowledged the viability of a joint employer theory under Section 515 by permitting the Plaintiffs to maintain their cause of action."[2] *Id.* at 494 (citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270 (2d Cir. 1992), *abrogated on other grounds as recognized in Gerosa v. Savasta & Co.*, 329 F.3d 317 (2d Cir. 2003), and *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912 (2d Cir. 1989)).

In the first *Diduck*, the viability of plaintiffs' joint employer claim arose in the context of whether the plaintiff-union member had standing to bring an action for delinquent contributions. The amended complaint alleged, inter alia, that the Kaszycki Corporation was in

---

[2] The court also denied the Trump defendants' motion for summary judgment on plaintiffs' claims that: (1) the Trump defendants were liable as a successor employer, and (2) the Trump defendants were liable because they knowingly participated in a scheme to deprive the funds of contributions by conspiring with the Kaszycki Corporation. 870 F. Supp. at 495.

violation of Section 515 by failing to contribute to the funds. 874 F.2d at 916. The pleading also asserted a Section 515 claim against the Trump defendants, "alleging that Trump-Equitable had taken control of the Kaszycki Corporation and assumed its obligations under the collective bargaining agreement." *Id.*

The lower court dismissed the union member's complaint on the ground that he lacked standing to sue because the trustees of the funds had not breached a fiduciary duty. *Id.* at 913. The Second Circuit reversed, finding that the trustees had breached their fiduciary duty by failing to even investigate the possibility of a lawsuit against the Trump defendants:

> [T]he record contains no indication that the Trustees discussed at their meetings the possibility of suing Trump-Equitable or consulted a lawyer to determine Trump-Equitable's potential liability under federal or state law. Judge Stewart [the lower court] noted, for example, that the Trump defendants may be liable under the joint employer doctrine. *See NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117 (3d Cir. 1982); *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235 (5th Cir.), *cert. denied*, 414 U.S. 819, 94 S. Ct. 43, 38 L.Ed.2d 51 (1973). . . . *This is not to say that the Trustees had a duty to sue Trump-Equitable. Rather, in light of the role Trump-Equitable had assumed, the Trustees had a duty to investigate the possibility of a lawsuit and make an informed decision whether or not to pursue that action.*

*Id.* at 918 (emphasis added). Thus, the court found that plaintiff had standing to prosecute this action. *Id.*

In the second *Diduck*, the Second Circuit let plaintiff's case against the Trump defendants proceed despite the fact that plaintiff had not made a demand on the trustees as required under Federal Rule of Civil Procedure 23.1. 974 F.3d at 287. The court did not rule on the merits of the joint employer claim. Rather, the court merely ruled that plaintiff's failure to make a demand was excused as any demand would have been futile; the trustees already had

sufficient information to act upon yet declined to do so.[3] *Id.*

After careful consideration of these cases, it is the Court's view that none of them mandates a conclusion that application of the joint employer doctrine under Section 515 is proper. Although there is language in the first *Diduck* that seems to support Plaintiffs' position, upon closer analysis, the Second Circuit never squarely ruled on the legitimacy of the joint employer doctrine in ERISA cases. Instead, the Second Circuit specifically stated that it was not indicating that the trustees had a duty to sue Trump Equitable, i.e., it was not indicating that the claim was necessarily viable. Rather, it was merely concluding that the trustees breached their fiduciary duty "to investigate the *possibility* of a lawsuit [against the Trump defendants] and make an *informed decision whether or not to pursue that action*." 874 F.2d at 918 (emphasis added). In this regard, the Second Circuit then offers *one example*, as noted by the lower court, as to how the Trump defendants *may* be held liable, i.e., as joint employers. It does not appear that this example was intended to be exhaustive nor that it was intended to indicate that this was necessarily a viable option under the facts of this case. Instead, the Second Circuit was simply ruling that the trustees should have investigated this possibility. In fact, in the subsequent decision by the lower court, plaintiffs proceeded against the Trump defendants on their Section

---

[3] In his concurrence, Judge Newman noted that he agreed with the majority that the claim against the Trump defendants should be allowed to proceed because plaintiff's failure to make demand on the funds was excusable, however, he "caution[ed] that it is by no means certain that Trump can be found liable as an employer." 974 F.2d at 291. He stated that this case was distinguishable from *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117 (3d Cir. 1982), where "the entity deemed to have become the employer set essential terms and conditions of employment." *Id.* "An owner faced with a job shut-down at his site must be free to advance funds to a defaulting contractor to meet the payroll without automatically thereby being deemed to have become an employer with full liability for all of the contractor's liabilities to the employees." *Id.*

515 claim not only as joint employers, but under two alternative grounds as well, viz. as a successor employer and under a conspiracy to defraud. *See Hardy*, 870 F. Supp. at 494-95.

Moreover, the two joint employer cases cited by the Second Circuit in the language quoted above are not ERISA cases; rather, they are labor law cases. *See Browning-Ferris Indus.*, 691 F.2d at 1124 (finding substantial evidence sustained finding of administrative law judge and National Labor Relations Board that employer and brokers were joint employer within the meaning of the National Labor Relations Act (the "NLRA")); *Hodgson*, 471 F.2d at 238 (finding that evidence supported finding that company was a joint employer for Fair Labor Standards Act (the "FLSA") purposes). As will be discussed *infra*, application of the joint employer doctrine in labor law cases does not require its application under ERISA as the statutes are not sufficiently analogous. (*See infra* at 14-16, 19.)

  **B.**  **Application of the Joint Employer Doctrine in Labor Law Cases**

The doctrine of joint employer status, as developed under the FLSA and the NLRA, recognizes that a worker may have more than one employer. *See Zheng v. Liberty Apparel Co.*, 355 F.2d 61, 66 (2d Cir. 2003) ("The regulations promulgated under the FLSA expressly recognize that a worker may be employed by more than one entity at the same time.") (citing 29 C.F.R. § 791.2 (2003)); *Gargano v. Diocese of Rockville Ctr.*, 888 F. Supp. 1274, 1278 n.2 (E.D.N.Y. 1995) ("The concept of 'joint employer' most frequently arises in the context of claims asserted under the [NLRA], whether by individuals or the National Labor Relations Board."), *aff'd*, 80 F.3d 87 (2d Cir. 1996). Whether a person "'possesse[s] sufficient control over the work'" of employees to qualify as a joint employer "'is essentially a factual issue.'" *International House v. NLRB*, 676 F.2d 906, 912 (2d Cir. 1982) (quoting *Boire v.*

*Greyhound Corp.*, 376 U.S. 473, 481 (1964)). Thus, in FLSA and NLRA cases, courts have consistently held that an individual who exerts sufficient control is directly responsible for a failure to pay statutorily required wages. *See, e.g.*, *Chen v. Street Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 289 (E.D.N.Y. 2005) (finding questions of fact existed as to whether manufacturer could be held jointly liable as joint employer under the FLSA); *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 195-96 (S.D.N.Y. 2003) (finding that drug store was joint employer jointly liable for wage violations); *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985) (finding that employer was joint employer under the NLSA and thus liable for back pay).

### C. *Distinction Between the Labor Law and ERISA*

With the exception of the *Hardy* case, none of Plaintiffs' cases cited in support of their claim that the Premier Defendants should be deemed joint employers with the PMB Defendants arises in the context of ERISA. Instead, most of Plaintiffs' cases arise under the FLSA or NLSA; others are employment discrimination actions. (*See* Pls.' Mem. in Supp. at 13-17.)

In *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383 (2d Cir. 1989), plaintiff sued the president of a company for the delinquent funds owed by the company under ERISA. The Second Circuit found that there were insufficient factual findings to support a conclusion that the president and the company were alter egos, thus justifying piercing the corporate veil. *Id.* at 387. The court noted, however, that in FLSA cases, "a corporate officer with operational control who is directly responsible for a failure to pay statutorily required wages is an 'employer' along with the corporation, jointly and severally liable for the shortfall." *Id.* The court went on to state:

> Despite the similarities between ERISA and FLSA, however, a number of courts have held that ERISA does not render corporate

> officers personally liable for a company's unpaid benefit-fund contributions unless the officers and the company are "alter egos" under traditional common law principles. The rationale for distinguishing the statutes in this respect, as expressed by the D.C. Circuit, is that *FLSA commands employers to pay specified wages, whereas ERISA does not require employers to provide pension plans; the obligation to do so, and to contribute to them, springs from a privately-made contract embodied in a plan or a collective bargaining agreement.*

*Id.* (emphasis added) (citations omitted). The Second Circuit concluded that it "need not decide in this case, however, whether to accept that rationale or whether to equate the scope of individual liability under ERISA and FLSA." *Id.* Because the president was not merely a controlling officer of a company that neglected to make required benefit plan contributions but had engaged in a criminal conspiracy to defraud the funds, he could held liable under the rationale that a corporate form should not be given effect where it was interposed to defeat legislative policies. *Id.* (quoting *Lowen*, 829 F.2d at 1220). Thus, the court held "to the extent that a controlling corporate official defrauds or conspires to defraud a benefit fund of required contributions, the official is individually liable under Section 502 of ERISA, 29 U.S.C.§ 1132, just as he would be liable for unpaid minimum wages under FLSA, even if the traditional conditions for piercing the corporate veil are not met." *Id.* at 388.

In *Solomon v. Laranne Sportswear Corp.*, 648 F. Supp. 407 (E.D.N.Y. 1986), Judge Nickerson held that the president and owner of at least 25 percent of a corporation's shares was not liable for delinquent pension contributions of the corporation in the absence of facts allowing disregard of corporate form. *Id.* at 409. Finding that "ERISA creates no independent substantive duty to make payments beyond that specified in the terms of the plan and the collective bargaining agreement," Judge Nickerson noted that there was nothing inconsistent

with his decision and the decisions under the FLSA. Id. "In those cases [under the FLSA] *the obligation to make the requisite payments did not stem from the terms of an agreement between employer and employee but from the legislation itself.*" *Id.* (emphasis added).

### D. *Application of the Joint Employer Doctrine to ERISA*

There is a paucity of case law on whether a joint employer may be bound to a collective bargaining agreement which he did not sign purely because of his joint employer status. As discussed above, the only case cited by Plaintiffs to raise this question is the *Hardy* case and the Court has not found that decision to be persuasive.

The Court's cursory search of the case law has revealed three cases applying the joint employer doctrine in the ERISA context. In *Michigan State Painters Ins. Fund v. Ron Simmons Painting, Inc.*, 875 F. Supp. 417 (E.D. Mich. 1995), the court found that genuine issues of material fact existed as to whether two companies could be considered joint employers under ERISA. *Id.* at 421-23. In *Southern Elec. Health Fund v. Kelley*, 308 F. Supp. 2d 847 (M.D. Tenn. 2003), the court found two companies to be joint employers under ERISA. *Id.* at 867. Neither case is instructive, however, because neither decision offers any discussion on the applicability of the joint employer doctrine to ERISA.

In a case similar to the factual posture of this action, Rheem Manufacturing Co. ("Rheem") leased a group of truck drivers from Knight Associates ("Knight") to haul finished products to Rheem dealers nationwide. *Rheem Mfg. Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 873 F. Supp. 173, 174 (W.D. Ark. 1994), *aff'd*, 63 F.3d 703 (8th Cir. 1995). Under their agreement, both companies shared control over the daily working conditions of the employees and, in fact, Rheem exercised the most control. *Id.* Knight,

however, entered into a collective bargaining agreement with the employees.[4]  *Id.*  In an action by the pension plan against Rheem, Rheem sought a declaration that it was not an "employer" under the MPPAA.  *Id.*[5]

In holding that the term "employer" under the MPPAA does not include joint employers, the court found that "in order to be an employer under MPPAA, a party must have an obligation to contribute that is purely contractual in nature.  That is, Rheem must have signed a contract obligating it to contribute to Central States, or it must be obligated by some other principle of traditional contract law, such as agency or alter ego theory."  *Id.* at 176.

The Court agrees with the rationale espoused in the *Rheem* case and finds that it is consistent with existing Second Circuit precedent which holds that in order to be an "employer who is obligated to make contributions" pursuant to Section 515, a party must have a contractual obligation to contribute, be the alter-ego of a signatory to the collective bargaining agreement, or involve a scheme to defraud employees of benefits.  (*See supra* at 7-8.)  The fact that the Second Circuit has sanctioned the application of the "alter ego" construct to ERISA cases does not mandate the same result with respect to joint employers.  The "alter ego" doctrine, as applied to

---

[4]  This case is different from the instant case in that here, the Premier Defendants acted as the lessor of the employees and did not sign the collective bargaining agreement.  In *Rheem*, plaintiff sought contributions from the lessee, which did not sign the collective bargaining agreement.  873 F. Supp. at 174.

[5]  The MPPAA is an amendment to ERISA which "imposes liability on employers who withdraw from multiemployer pension funds for their proportionate share of unfunded vested benefits."  *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 85 F.3d 1282, 1285 (7th Cir. 1996).  The term "employer" under the MPPAA has been defined as a "person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants."  *Korea Shopping Corp. v. New York Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Fund Trust*, 880 F.2d 1531, 1537 (2d Cir. 1989).

contributions under ERISA, "looks to a mere technical change in the identity of a single corporation in order to gain an unfair advantage, not to the control two separate companies exercise over the same employees, as is demonstrated by joint employers." *See Sun Chemical Corp. v. International Bhd. of Teamsters Local No. 705*, Nos. 89 C 7112, 89 C 8032, 1992 WL 133175, at *3 (N.D. Ill. June 11, 1992) (citations omitted); *see also Leddy*, 875 F.2d at 387 ("The Supreme Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies.") (citation and internal quotation marks omitted); *Starrett Paving Corp.*, 845 F.2d at 26 ("[W]here the owner is the corporations' alter ego, . . . it is fairly easy to say that the owner *is* the corporation, and that the owner is therefore the 'employer' (under ERISA's definition) 'who is obligated' (under state law) 'to make contributions to' a pension plan."). Here, there is no claim that the Premier and PMB Defendants are the same entity nor are there any allegations of fraudulent intent.

In addition, finding that nonsignatories to a collective bargaining agreement may not be liable for contributions under Section 515 barring the above-mentioned circumstances is consistent with the *Bleiler* and *Greenblatt* cases, where the Second Circuit refused to impose Section 515 liability on sureties and contractors who were not signatories to the collective bargaining agreements where the alleged basis for that liability arose from "a contractual relationship separate from the collective bargaining agreement." *Bleiler*, 72 F.3d at 15; *Greenblatt*, 68 F.3d at 575. Similarly, in the instant case, the Client Services Agreements between the Premier and PMB Defendants did not bind the Premier Defendants to the terms of the collective bargaining agreements between the PMB Defendants and Plaintiffs.

Moreover, this result comports with both the Congressional intent, as well as the

case law, interpreting Section 515. *See Xaros v. U.S. Fidelity and Guar. Co.*, 820 F.2d 1176, 1179 (11th Cir. 1987) ("Courts presented with the issue have generally refused to expand the definition of employer under ERISA to include entities which were not a party to the collective bargaining agreement under which suit is brought.") (citing *Carpenters S. Ca. Admin. Corp. v. D & L Camp Constr. Co.*, 738 F.2d 999 (9th Cir. 1984) and *Carpenters S. Ca. Admin. Corp. v. Majestic Housing*, 743 F.2d 1341 (9th Cir. 1984), *both abrogated on other grounds as recognized in Trustees of Elec. Workers Health & Welfare Trust v. Marjo Corp.*, 988 F.2d 865 (9th Cir. 1992), and *Laborers Local 938 Joint Health & Welfare Trust Fund v. B.R. Starnes Co.*, 658 F. Supp. 305 (S.D. Fla. 1986), *aff'd*, 827 F.2d 1454 (11th Cir. 1987)); *see also Starrett Paving Corp.*, 845 F.2d at 25 (noting that Section 515's legislative history demonstrates that statute's purpose was "'to give employers a strong incentive to honor their *contractual* obligations to contribute'") (quoting *Laborers Health and Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539 (1988)); *Solomon v. Klein*, 770 F.2d 352 (3d Cir. 1985) (rejecting analogy of ERISA to the FLSA and refusing to impose personal liability on corporate officer unless corporate veil pierced).

Finally, the Court is persuaded that the joint employer cases under the Labor Law are not sufficiently analogous to ERISA to warrant their application thereto. While the Labor Law requires employers to pay specified wages, ERISA does not require employers to provide pension plans or to contribute to them; the obligation to do so arises purely from a privately made contract, or in our case, collective bargaining agreements entered into between Plaintiffs and the PMB Defendants. *See Leddy*, 875 F.2d at 387.

Thus, in sum, the Court finds that whether or not the Premier Defendants are joint

employers under the FLSA or the NLSA is of no significance here as there is no authority warranting the imposition of liability on a joint employer which did not sign the relevant collective bargaining agreement where there are no allegations of fraud or piercing the corporate veil. Accordingly, the Premier Defendants cannot be held liable to Plaintiffs under Section 515 based solely upon their alleged joint employer status.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED and the Premier Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, N.Y.
August 24, 2005

/s_____
Denis R. Hurley,
United States District Judge